**ORAL ARGUMENT NOT YET SCHEDULED**

No. 13-7145 (Consolidated with 13-7146)

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

FILMON X, LLC, *et al.*,
*Defendants-Appellants*

v.

FOX TELEVISION STATIONS, INC., *et al.*,
*Plaintiffs-Appellees.*
_____

On Appeal from the United States District Court
for the District of Columbia, Case No. 13-cv-00758-RMC (Collyer, J.)
_____

**OPENING BRIEF OF DEFENDANTS-APPELLANTS
FILMON X, LLC, *ET AL.***
_____

Ryan G. Baker
Scott M. Malzahn
BAKER MARQUART LLP
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
(424) 652-7811 (telephone)
(424) 652-7850 (facsimile)
rbaker@bakermarquart.com
smalzahn@bakermarquart.com

Kerry J. Davidson
LAW OFFICE OF KERRY J. DAVIDSON
1738 Elton Road, Suite 113
Silver Spring, Maryland 20903
(301) 586-9516 (telephone)
(866) 920-1535(facsimile)
kdavidson@selflaw.com

*Attorneys for Defendants-Appellants
FilmOn X, LLC, FilmOn.TV, Inc.,
FilmOn.TV Networks, Inc., and FilmOn.com, Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Defendants-Appellants make the following certification of counsel:

### A.    Parties And Amici

Defendants-Appellants FilmOn X, LLC, FilmOn.TV Networks, Inc., FilmOn.TV, Inc., and FilmOn.com, Inc. (collectively, "FilmOn X" or "Defendants-Appellants") appeared in the district court and are parties in this Court.

Plaintiffs-Appellees Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, Fox Broadcasting Company, NBC Subsidiary (WRC-TV) LLC, NBC Studios LLC, Universal Network Television LLC, Open 4 Business Productions LLC, Telemundo Network Group LLC, American Broadcasting Companies, Inc., Disney Enterprises, Inc., Allbritton Communications Company, CBS Broadcasting Inc., CBS Studios, Inc. and Gannet Co., Inc. (collectively, "the Networks" or "Plaintiffs-Appellees") appeared in the district court and are parties in this Court.

No amici appeared in the district court proceedings.  FilmOn X expects a number of amici to file amicus briefs in support of both sides in this appeal, although none have been filed yet.

### B.    Rulings Under Review

The following rulings are at issue in this appeal:

1.      The September 5, 2013 Order Granting Plaintiffs' Motion for Preliminary Injunction (Dkt. No. 34) and related Memorandum Opinion by the Honorable Rosemary M. Collyer (Dkt. No. 33), which are reproduced in the Joint Appendix at ER001125 and ER001089.  The official citation for the Memorandum Opinion is pending.

2.      The September 12, 2013 Order Denying Defendants' Motion for Reconsideration (Dkt. No. 42) and related Memorandum Opinion (Dkt. No. 41) by Judge Collyer, which are reproduced in the Joint Appendix at ER001133 and ER001323.  There is no official citation for the Memorandum Opinion.

## C.      Related Cases

This case has not previously been before this Court or any other court other than the district court below; however, there are the following related cases pending in other circuits:

1.      On March 1, 2012, many of the same plaintiff-networks in this case, including Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, NBC Studios LLC, Universal Network Television LLC, Telemundo Network Group LLC, American Broadcasting Companies, Inc., Disney Enterprises, Inc., CBS Broadcasting, Inc., and CBS Studios, Inc., filed two copyright infringement actions against a FilmOn X competitor, Aereo, Inc., in the United States District Court for the Southern District of New York.  Those plaintiffs allege in

consolidated actions that Aereo's remote antenna and DVR technology—which the district considered as having no legally relevant differences to FilmOn X's technology—infringed their asserted public performance and reproduction rights under the Copyright Act.  The plaintiffs filed a motion for a preliminary injunction.  On July 11, 2012, the district court denied the motion, ruling that the networks were unlikely to succeed on the merits of their claims.  *Am. Broad. Cos., Inc. v. Aereo, Inc.,* 874 F. Supp. 2d 373 (S.D.N.Y. 2012).  On April 1, 2013, the Court of Appeals for the Second Circuit affirmed that decision in favor of Aereo.  *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 680 (2d Cir. 2013).  The plaintiffs moved for rehearing *en banc*, which was denied on July 16, 2013. *WNET, Thirteen v. Aereo, Inc.*, 722 F.3d 500 (2d Cir. 2013).  The plaintiffs filed a petition for writ of certiorari with the Supreme Court on October 11, 2013, which is currently pending.  *Am. Broad. Cos., Inc., et al. v. Aereo, Inc.*, (2d Cir. 2013), *petition for cert. filed*, No. 13-461  (U.S. Oct. 11, 2013).

2.      On August 10, 2012, many of the same plaintiff-networks in this case brought an action for copyright infringement against FilmOn X and various related entities in the United States District Court for the Central District of California.  As in the New York cases filed against Aereo, the plaintiffs in this California action similarly allege that the mini-antenna and DVR technology used by FilmOn X infringes the plaintiffs' public performance rights under the

Copyright Act.  The plaintiffs filed a motion for a preliminary injunction.  On

December 27, 2012, the district court granted the plaintiffs' motion for a

preliminary injunction, but limited the scope of the injunction to the Ninth

Circuit.  *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F.

Supp. 2d 1138 (C.D. Cal. 2012).  FilmOn X appealed.  The Ninth Circuit held oral

argument in that appeal on August 27, 2013.  *See Fox Television Stations, Inc. v.

BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012), *appeal

docketed sub nom.*, *Fox Television Stations, Inc. v. FilmOn X LLC*, No. 13-55156

(9th Cir. Jan. 25, 2013).  To date, the Ninth Circuit has not yet ruled.

  3. On July 9, 2013, Hearst Stations Inc. ("Hearst") (owner of WCVB-

TV) filed another copyright infringement action against Aereo in the United States

District Court for the District of Massachusetts.  As in the other cases, Hearst filed

a motion for a preliminary injunction, alleging Aereo's mini-antenna and DVR

technology infringes their public performance rights.  On October 8, 2013, the

district court denied the motion.  *See Hearst Stations, Inc., d/b/a WCVB-TV v.

Aereo, Inc.*, No. 13-cv-11649-NMG, 2013 WL5604284 (D. Mass. Oct. 8,

2013).  Hearst appealed.  The plaintiffs-appellants' opening brief before the First

Circuit is due December 9, 2013 and defendant-appellee's brief is due January 8,

2014.  *See* October 28, 2013 Briefing Notice, *Hearst Stations, Inc., d/b/a WCVB-*

*TV v. Aereo, Inc.*, No. 13-cv-11649-NMG (D. Mass. July 9, 2013), *appeal docketed*, No. 13-2282 (1st Cir. Oct. 16, 2013) (No docket number).

4.      On October 24, 2013 Nextstar Broadcasting, Inc. ("Nextstar") (owner of KTVX ABC4 and KUCW CW30) filed a copyright infringement action against Aereo in the United States District Court for the District of Utah.  On October 25, 2013, Nextstar filed a motion for a preliminary injunction, once again alleging Aereo's mini-antenna and DVR technology infringes its public performance rights. See docket number 8, *Nexstar Broadcasting v. Aereo*, Case Number 2:13-cv-00975 (D. Utah).  The motion has not yet been heard.  *See* docket for *Nexstar Broadcasting v. Aereo*, Case Number 2:13-cv-00975 (D. Utah).

5.      On November 22, 2013, FilmOn X filed its own copyright action for declaratory relief in the United States District Court for Northern District of Illinois against the licensee of a Chicago television station, which had threatened to sue FilmOn X for copyright infringement.  FilmOn X seeks a declaration from the district court to establish that its mini-antenna and DVR technology does not violate the licensee's public performance rights.  *FilmOn X, LLC v. Window to the World Comms., Inc.*, Case No. 13-cv-08451 (Dkt. No. 1).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Defendants-Appellants provide the following certifications:

FilmOn X, LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

FilmOn.TV Networks, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

FilmOn.TV, Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

FilmOn.com Inc. has no parent corporation and no publicly held corporation owns 10 percent or more of its stock.

As relevant to the litigation, Defendants-Appellants provide a technology platform that enables consumers to use remotely located equipment to create, access, and watch their own unique recorded copies of free over-the-air broadcast television programming.

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ....... i

    A.   Parties And Amici .................................................................. i

    B.   Rulings Under Review .......................................................... i

    C.   Related Cases ...................................................................... ii

**CORPORATE DISCLOSURE STATEMENT** ................................... vi

**TABLE OF CONTENTS** ........................................................... vii

**TABLE OF AUTHORITIES** ......................................................... ix

**GLOSSARY** ............................................................................ xiii

**INTRODUCTION** ........................................................................1

**JURISDICTIONAL STATEMENT** .................................................3

**STATEMENT OF THE CASE** ......................................................4

**STATUTES AND REGULATIONS** ...............................................8

    17 U.S.C. § 101 ....................................................................8

    17 U.S.C. § 106 ....................................................................8

    17 U.S.C. § 502 ....................................................................9

**STATEMENT OF ISSUES FOR REVIEW** ......................................9

**STATEMENT OF FACTS** .........................................................10

    A.   The Networks Duty To Provide Free Over-The-Air Content .............11

    B.   FilmOn X's Technology ......................................................13

        1.   The Individual User of FilmOn X's Experience ..........14

        2.   The Technical Aspects of FilmOn X's Technology ....................16

    C.   The Harmful Effects of the Preliminary Injunction .............................18

**SUMMARY OF ARGUMENT** ........................................................................**19**

**ARGUMENT** ........................................................................................................**22**

I.    Standard Of Review ..............................................................22

II.   The Networks Did Not Establish A Likelihood Of Success On The
      Merits ...................................................................................23

      A.    *Aereo* And *Cablevision* Properly Interpret The Transmit
            Clause ..........................................................................24

      B.    Consumers Use FilmOn X's Technology To Make Only Private
            Transmissions, Which Do Not Violate The Transmit Clause .....28

      C.    The District Court's Interpretation Of The Transmit Clause Is
            Flawed..........................................................................30

            1.    The District Court Misreads The Plain Text Of The
                  Transmit Clause ....................................................31

            2.    The Legislative History Does Not Support The District
                  Court's Reading ....................................................33

III.  The Networks Failed To Demonstrate Irreparable Harm .....................39

IV.   The Balance of Hardships Favors FilmOn X ........................................43

V.    The District Court's Rulings Harm The Public Interest ........................45

VI.   At A Minimum, The Scope Of Any Injunction Should Be Limited To
      The D.C. Circuit...................................................................48

**CONCLUSION**....................................................................................**52**

**CERTIFICATE OF COMPLIANCE** ................................................**53**

**CERTIFICATE OF SERVICE** ..........................................................**54**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Broad. Companies, Inc. v. Aereo, Inc.*,
  874 F. Supp. 2d 373 (S.D.N.Y. 2012) ....................................................18, 42, 45

*United States v. AMC Entm't, Inc.*,
  549 F.3d 760 (9th Cir. 2008) ............................................................................51

*Belushi v. Woodward*,
  598 F. Supp. 36 (D.D.C.1984)....................................................................43, 44

*Califano v. Yamasaki*,
  442 U.S. 682 (1979)..........................................................................................50

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)
  ..............................2, 12, 13, 23, 24, 25, 26, 27, 28, 30, 33, 34, 37, 38, 39, 47, 48

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)....................................................................23, 42

*Columbia Broadcasting System, Inc. v. Democratic National Committee*,
  412 U.S. 94 (1973)............................................................................................30

*eBay, Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..........................................................................................41

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary*,
  454 U.S. 100 (1981)..........................................................................................51

*Fortnightly Corp. v. United Artist Television, Inc.*,
  392 U.S. 390 (1968)....................................................................................35, 36

*Fox Broad. Co., Inc. v. Dish Network L.L.C.*,
  723 F.3d 1067 (9th Cir. 2013) ....................................................................13, 24

*Authorities upon which the brief chiefly relies on are marked by
  asterisks.

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
   915 F. Supp. 2d at 1147 (C.D. Cal. 2012) ...............................................20, 42, 51

*GEO Specialty Chemicals, Inc. v. Husisian*,
   923 F. Supp. 2d 143 (D.D.C. 2013)...........................................................40, 41

*Health Ins. Ass'n of Am. v. Novelli*,
   211 F. Supp. 2d 23 (D.D.C. 2002).....................................................................43

*\*Hearst Stations, Inc., d/b/a WCVB-TV v. Aereo, Inc.*,
   No. 13-cv-11649-NMG, 2013 WL5604284 (D. Mass. Oct. 8, 2013)
   .......................................................................................................................2, 7

*Holland v. National Mining Association*,
   309 F.3d 808 (D.C. Cir. 2002)....................................................................48, 50

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
   545 U.S. 913 (2005).........................................................................................46

*Mylan Pharm., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000)......................................................................41

*NAACP, Jefferson Cnty. Branch v. Brock*,
   619 F. Supp. 846 (D.D.C. 1985).......................................................................51

*N.L.R.B. v. P*I*E Nationwide, Inc.*,
   894 F.2d 887 (7th Cir. 1990) ...........................................................................51

*Paramount Pictures Corp. v. ReplayTV*,
   298 F. Supp. 2d 921 (C.D. Cal. 2004) .............................................................23

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*,
   237 F.3d 1359 (Fed. Cir. 2001) ........................................................................41

*Random House, Inc. v. Rosetta Books LLC*,
   283 F.3d 490 (2d Cir. 2002) .............................................................................44

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969).....................................................................................12, 29

*Schauss v. Metals Depository Corp.*,
   757 F.2d 649 (5th Cir.1985) .............................................................................51

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ..........................................................................23

*Softman Prods. Co., LLC v. Adobe Systems, Inc.*,
    171 F. Supp. 2d 1075 (C.D. Cal. 2001) ............................................................46

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)............................................... 12, 23, 29, 30, 33, 37

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
    415 U.S. 394 (1974)...........................................................................................35

*Turner Broadcasting System, Inc. v. FCC*,
    520 U.S. 180 (1997)...........................................................................................29

*Virginia Soc'y for Human Life v. Federal Election Comm'n*,
    263 F.3d 379 (4th Cir. 2001) ...........................................................................50

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................19

*Wisc. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir.1985) (per curiam)....................................................40

*WNET, Thirteen v. Aereo, Inc.*,
    712 F.3d 676 (2d Cir. 2013) ...........................................2, 18, 21, 23, 27, 42

**Federal Statutes**

*17 U.S.C. § 101 ...........................................................................8, 25, 31, 32

*17 U.S.C. § 106 ..............................................................................................8, 25

17 U.S.C. § 502 ..............................................................................................9, 48, 49

28 U.S.C. § 1292(a)(1)........................................................................................4

28 U.S.C. §§ 1331, 1338(a) .............................................................................3

47 U.S.C. § 303................................................................................................28

47 U.S.C. § 307(a) ......................................................................................12, 29

47 U.S.C. § 309(k).............................................................................................29

47 U.S.C. § 325(b) ...........................................................................29

47 U.S.C. § 534 ................................................................................29

47 U.S.C. § 543(b)(8) .......................................................................29

Copyright Act of 1856, 11 Stat. 138 (1856) ...............................33, 34

Copyright Act of 1897, 29 Stat. 481 (1897) ...............................33, 34

Copyright Act of 1909, §1(c)-(e), 35 Stat. 1075 (1909) ..................34

**Other Authorities**

"CTIA and CEA Study Finds Broadcast Incentive Auction Will
     Net U.S. Treasury More Than $33 Billion," Feb. 15, 2011,
     http://www.ctia.org/media/press/body.cfm/prid/2051. ...................12

Fed. R. App. P. 4(a)(1) .......................................................................4

Fed. R. App. P. 4(a)(4)(B)(ii) ............................................................4

H.R. Rep. 94-1476, at 65 (1976), reprinted in 1976 U.S.C.C.A.N.
     5659......................................................................................25, 34

Register of Copyrights, Copyright Law Revision, Supplementary
     Report of the Register of Copyrights on the General Revision of
     the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess.,
     at 22 (Comm. Print 1965) ...............................................................35

*Third Annual Report of the Federal Radio Commission* 34 (1929),
     available at http://transition.fcc.gov/fcc-
     bin/assemble?docno=291101 ...........................................................12

Thomas Hazlett, in "A National Broadband Plan for Our Future," GN
     Dckt. No. 09-51, Federal Communications Commission (filed Dec.
     18, 2009)
     http://mason.gmu.edu/thazlett/pubs/NBP_PublicNotice26_DTVBa
     nd.pdf ...............................................................................................11

# GLOSSARY

| | |
|---|---|
| ***Aereo*** | *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 680 (2d Cir. 2013) |
| ***BDCS*** | *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138 (C.D. Cal. 2012), *appeal docketed sub nom.*, *Fox Television Stations, Inc. v. FilmOn X, LLC*, No. 13-55156 (9th Cir. Jan. 25, 2013) |
| ***Cablevision*** | *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121(2d Cir. 2008), *cert. denied* 557 U.S. 946 (2009). |
| **Copyright Act** | Copyright Act of 1976, 17 U.S.C. § 101, *et seq.* |
| **DVR** | Digital Video Recorder |
| **FilmOn X** | Defendants-Appellants FilmOn X, LLC, FilmOn.TV Networks, Inc., FilmOn.TV, Inc., and FilmOn.com, Inc. |
| ***Hearst*** | *Hearst Stations, Inc., d/b/a WCVB-TV v. Aereo, Inc.*, No. 13-cv-11649-NMG (D. Mass. July 9, 2013), *appeal docketed*, No. 13-2282 (1st Cir. Oct. 16, 2013) |
| **The Networks** | Plaintiffs-Appellees Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, Fox Broadcasting Company, NBC Subsidiary (WRC-TV) LLC, NBC Studios LLC, Universal Network Television LLC, Open 4 Business Productions LLC, Telemundo Network Group LLC, American Broadcasting Companies, Inc., Disney Enterprises, Inc., Allbritton Communications Company, CBS Broadcasting Inc., CBS Studios, Inc. and Gannet Co., Inc. |
| **Transmit Clause** | 17 U.S.C. § 101 |

## INTRODUCTION

Congress and the courts have always protected an individual's right to privately perform copyrighted works. That right is at stake in this case. The district court's ruling deprives the individual of the right to employ new technology to privately perform the Networks'[1] copyrighted works. That ruling misunderstands FilmOn X's[2] technology and misinterprets the plain language of the Copyright Act. This Court should reverse.

Private performance is the only type of performance enabled by FilmOn X. FilmOn X offers its users the ability to control a uniquely assigned miniature antenna and digital recording device ("DVR") to receive, record and view a unique copy of the Networks' programming. No two users may control a FilmOn X antenna at one time; nor may any two users view the same copy of the Networks' programming. Indeed, the primary difference between a FilmOn X mini-antenna and a set of rabbit ears or a rooftop antenna is the location of the hardware receiving free over-the-air broadcast signals. Just as the manufacturers of televisions, digital antennas and set-top boxes available at Best Buy are not liable

---

[1] The "Networks" are plaintiff-appellees Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, Fox Broadcasting Company, NBC Subsidiary (WRC-TV) LLC, NBC Studios LLC, Universal Network Television LLC, Open 4 Business Productions LLC, Telemundo Network Group LLC, American Broadcasting Companies, Inc., Disney Enterprises, Inc., Allbritton Communications Company, CBS Broadcasting Inc., CBS Studios, Inc. and Gannet Co., Inc.
[2] For purposes of this brief, "FilmOn X" is defendants-appellants FilmOn X LLC, FilmOn.TV Networks, Inc., FilmOn.TV, Inc., and FilmOn.com Inc.

1

for copyright infringement based on users' activities, FilmOn X is not liable for the private performances its users make.

Because each mini-antenna is unique and controlled by only one FilmOn X user, each transmission a user may make using FilmOn X technology is private. The district court found those transmissions public, because it reasoned that each discrete transmission of the same program by different users must be aggregated. But that conclusion does not withstand scrutiny.  Each of FilmOn X's users transmits the content to himself or herself alone, from a unique copy, stored on a remotely hosted DVR.

One other circuit court has considered and ruled on these issues.  The Second Circuit found similar technology legal.  *See Aereo*, 712 F.3d 676 (2d Cir. 2013); *see also Cablevision,* 536 F.3d 121(2d Cir. 2008).  The Massachusetts District Court agreed.  *See Hearst*, No. 13-cv-11649-NMG, 2013 WL 5604284 (D. Mass. Oct.8, 2013), *appeal docketed*, No. 13-2282 (1st Cir. Oct. 16, 2013). Although the district court here found no meaningful distinction between the technology involved in those cases and FilmOn X's technology, the court inexplicably reached a different result.  That result seriously threatens the individual's right of private performance, which should not be dependent on the location where an individual chooses to store a unique copy of a copyrighted work. Nor should that right depend on the location of the technology used to make such a

unique copy.

Based on its finding that the transmission a consumer makes using FilmOn X's technology constitutes a public performance under the Copyright Act, the district court enjoined FilmOn X from operating its service everywhere except the Second Circuit. This ruling was in error.

The court also erred in enjoining FilmOn X across the nation, when courts in other circuits are actively considering the same issues, applying the law of their respective circuits. Applying First Circuit law, the district court of Massachusetts recently found similar technology did not infringe any copyright. Other actions are pending before the Northern District of Illinois and Utah District Court. The court in this case should have exercised its discretion to limit the scope of its injunction.

Each of FilmOn X's users receives, records, and transmits a unique copy of Plaintiffs' programming. Accordingly, any transmission (or performance) enabled by FilmOn X's technology is decidedly private. This Court should reverse the ruling of the district court to enjoin FilmOn X. Alternatively, this Court should direct the district court to limit the scope of the injunction to the geographic boundaries of the D.C. Circuit.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction to hear the Networks' preliminary injunction motions pursuant to 28 U.S.C. §§ 1331, 1338(a). This Court has

jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

The district court's order granting the preliminary injunction was entered on September 9, 2013.  (ER001089 and ER001125.)  The order became effective on September 9, 2013.  (ER001129.)[3]  The district court's order denying FilmOn X's motion for reconsideration was entered on September 12, 2013 (ER001323 and ER001333.)  FilmOn X timely appealed on September 16, 2013.  (ER001343 and ER001347.)  *See* Fed. R. App. P. 4(a)(1) and Fed. R. App. P. 4(a)(4)(B)(ii).

## STATEMENT OF THE CASE

On May 23, 2013, the Networks (the four major national broadcast television networks—ABC, CBS, Fox, and NBC—as well as other distributors, rights holders, and DC-area television broadcasters) filed this copyright infringement lawsuit.  (ER000033.)

The Networks filed a first amended complaint on May 24, 2013, alleging that FilmOn X was infringing upon their rights of public performance by providing consumers with access to a remote antenna and remote DVR in order to record and watch free over-the-air television broadcasts.  (ER000057.)  FilmOn X filed an answer and counter-complaint on June 27, 2013, denying the allegations and seeking a judgment declaring that FilmOn X does not violate the Copyright Act with respect to the Network's copyrighted works.  (ER000207 and ER000189.)

---

[3] The order became effective after the bond posting requirements were met on September 9, 2013.  (ER001129.)

4

On August 8, 2013, the Networks moved for a preliminary injunction against FilmOn X, seeking to prohibit FilmOn X's customers from using remote antennas and DVRs to record and watch free over-the-air television broadcasts.  (ER000239.)  The Networks alleged that FilmOn X's technology amounted to illegal Internet retransmissions of their copyrighted works.  (ER000243.)  FilmOn X opposed the motion on the basis that its technology simply provided a convenient platform for consumers to use existing, legal technology to access content they have a legal right to view for free.  (ER000961.)  FilmOn X also argued that any injunction should be limited to the D.C. Circuit because of substantially similar cases then pending in courts in the First, Second and Ninth Circuits.[4] (ER000993.)  The parties requested an evidentiary hearing.  (ER000239.)

Without holding a hearing on the Networks' motion, the district court granted the preliminary injunction on September 5, 2013, and took the evidentiary hearing off-calendar.  (ER001089.)  The district court based its understanding of the technology on the declarations submitted by the parties and its conclusion that FilmOn X's technology is not relevantly different in terms of the issues in this case from Aereo, Inc.'s ("Aereo's") technology as described in *Aereo*.  (ER001092-

---

[4] Since the district court below issued the injunction at issue in this appeal, FilmOn X has filed a related lawsuit for declaratory relief in the United States District Court for the Northern District of Illinois.  Another action, involving Aereo, Inc., is pending in the Utah District Court.

93.)  In fact, the district court expressly found that "the systems [used by Aereo and FilmOn X] are essentially the same, and the parties agree that there are no legally meaningful differences."  (ER001092.)

Despite relying on the Second Circuit's description of the technology in *Aereo*, the district court concluded, in contrast to the Second Circuit's holding, that the Networks were entitled to a preliminary injunction.  The district court held that the Networks were "likely to succeed on their claim that FilmOn X violates [the Networks]'s exclusive public performance rights in their copyrighted works." (ER001090.)  And "because there is no dispute of fact between the parties the Court will grant [the Networks]' motion for a preliminary injunction . . . ."  (*Id.*) Based upon this finding, the district court held the other prongs of the preliminary injunction analysis all tipped in the Networks' favor as well.  (ER001117; ER001120.)  The district court entered a preliminary injunction that covered the entire country except for the Second Circuit.  (ER001089-1125.)

On September 11, 2013, FilmOn X filed an emergency motion for reconsideration of the geographic scope of the injunction and bond amount. (ER001171.)  FilmOn X argued, among other things, that the scope of the injunction should be limited to the D.C. Circuit in light of the other substantially similar cases making their way through the court system in varying districts and the harm the nearly nationwide injunction would cause FilmOn X.  (*Id.*)  The

6

district court denied that motion on September 12, 2013, finding that principles of comity did not warrant limiting the geographic scope of the injunction. (ER001323, ER001333.)

After FilmOn X filed the notice of appeal in this case, on October 8, 2013, the District Court of Massachusetts issued its decision in *Hearst*, Case No. 13-cv-11649-NMG (Docket No. 72). It ruled in favor of Aereo, denying the plaintiff-networks' motion for a preliminary injunction and agreeing with the Second Circuit's interpretation of the Transmit Clause in the Copyright Act. *See*, *Hearst*, No. 13-cv-11649-NMG, 2013 WL 5604284 (D. Mass. Oct. 8, 2013), *appeal docketed*, No. 13-2282 (1st Cir. Oct. 16, 2013).

Shortly thereafter, on October 10, 2013, FilmOn X filed an emergency motion to modify the scope of the preliminary injunction so that FilmOn X would be allowed to operate its services in the First Circuit where the *Hearst* decision had been issued. (ER0014696.) In its ruling on the motion, the district court acknowledged that the "*Hearst* [court] dealt with copyright infringement issues similar to those already addressed here and came to the opposite conclusion." (ER001553; *see also* ER001554.) Nevertheless, the district court denied the motion, concluding that "[a] contrary decision by a co-equal court in another district involving different parties does not represent a change in controlling law." (ER001554.)

7

# STATUTES AND REGULATIONS

## 17 U.S.C. § 101

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

    …

A "device", "machine", or "process" is one now known or later developed.
….

To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process or, in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible.
…

To perform or display a work "publicly" means--

> **(1)** to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

> **(2)** to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

    …

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

## 17 U.S.C. § 106

Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

> **(1)** to reproduce the copyrighted work in copies or phonorecords;

**(2)** to prepare derivative works based upon the copyrighted work;

**(3)** to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

**(4)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

**(5)** in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

**(6)** in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

## 17 U.S.C. § 502

**(a)** Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

**(b)** Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person. The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

## STATEMENT OF ISSUES FOR REVIEW

1.    In issuing a preliminary injunction and denying FilmOn X's motion

for reconsideration, did the district court incorrectly interpret the Transmit Clause,

when it found that that a FilmOn X user's private viewing – using a uniquely

assigned FilmOn X antenna and digital video recorder – of a unique copy of a plaintiff's copyrighted work is a public, and not a private, performance?

2.     In issuing a preliminary injunction and denying FilmOn X's motion for reconsideration, did the district court err when it ignored the relevance of the uniqueness of the copy from which an individual transmission originates to the analysis of whether a performance of that copy is private or public under the Copyright Act?

3.     Did the District Court err when it enjoined FilmOn X throughout the United States except for the Second Circuit, although courts in other federal circuits have disagreed with the district court's interpretation of the Copyright Act (*i.e.*, supported FilmOn X's position) and/or are currently considering the same legal issues?

## STATEMENT OF FACTS

Consumers increasingly look to the Internet as a medium to access and watch free-over-the-air content.  FilmOn X provides consumers with that convenience.  FilmOn X and Aereo compete in an emerging technology industry, in which they provide consumers with the ability to view and record over-the-air content that already is broadcast for free on the public airwaves through the Internet.  As the district court recognized, FilmOn X is "a service that uses the Internet to give consumers the ability to watch live over-the-air television channels

through their computers and on their mobile devices.  FilmOn X also has a digital

video recorder, or DVR, capability, permitting users to pause live programming or

record shows for later viewing."  (ER001089.)

The television programming at issue in this lawsuit is freely available over

the air.  Anyone with a digital antenna and DVR within the Networks' broadcast

area may privately receive, record, and view their programming.  FilmOn X

provides consumers with the same technology those users may otherwise

implement in their own homes; FilmOn X's technology, however, is typically not

located in a user's home.  It is located remotely, within the Networks' broadcast

region, and is operated by the user over the Internet.  Moving a user's antenna and

DVR from the user's home to another location does not render that user's private

performance public.

## A.     The Networks Duty To Provide Free Over-The-Air Content

The Networks, along with other television broadcasters, use, for free, a

resource worth billions of dollars (or more)[5] – the public radio spectrum.   Pursuant

---

[5] Economist Thomas Hazlett has explained that "Today, the social
opportunity cost of using the TV Band for television broadcasting – 294 MHz of
spectrum with excellent propagation characteristics for mobile voice and data
networks, including 4G technologies – is conservatively estimated to exceed
$1 trillion (in present value)."  Comment of Thomas Hazlett, in "A National
Broadband Plan for Our Future," GN Dckt. No. 09-51, Federal Communications
Commission (filed Dec. 18. 2009), *available at*
http://mason.gmu.edu/thazlett/pubs/NBP_PublicNotice26_DTVBand.pdf.  More
conservatively, CTIA, The Wireless Association and the Consumer Electronics
Association, have concluded that the FCC's broadcast incentive auctions,
where only a few broadcasters would give up their licenses to more
productive uses, could produce more than $33 billion in revenue for the U.S.

to the Communications Act of 1934, television networks are granted licenses to operate only if the "public convenience, interest, or necessity will be served thereby."  47 U.S.C. § 307(a).  Since the earliest days of broadcasting, policymakers have required stations to make their service freely available to the public.  *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969); *see also Third Annual Report of the Federal Radio Commission* 34 (1929), available at http://transition.fcc.gov/fcc-bin/assemble?docno=291101.  Thus, by law, the Networks in this case are required to provide consumers with access to over-the-air content for free.

Historically, consumers have used antennas to capture and view over-the-air broadcast content for free.  As technological advancements were made, consumers were provided with access to products – such as the VCR – that allowed them to record free over-the-air content for viewing at a later time.  *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984).  Consumers today commonly use DVRs at home to watch recorded television programming at their convenience.  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").  Consumers can capture over-the-air broadcast television content via an antenna, make copies of that programming on a DVR and, using a device

---

Treasury.  *See* "CTIA and CEA Study Finds Broadcast Incentive Auction Will Net U.S. Treasury More Than $33 Billion," Feb. 15, 2011, http://www.ctia.org/media/press/body.cfm/prid/2051.

like a Slingbox,[6] view their recorded content via the Internet on an Internet-connected device such as a television, phone or tablet. *See, e.g., Fox Broad. Co., Inc. v. Dish Network L.L.C.*, 723 F.3d 1067 (9th Cir. 2013). Using these hardware devices, consumers can begin watching these programs either while the program is still airing or at a later time after the program has ended. When watching a recording of a program while it is still being broadcast, users can pause the program to resume watching later, rewind the recording to replay an earlier scene, or fast-forward to another part of the program.

## B.     FilmOn X's Technology

FilmOn X's technology required a substantial investment of time and resources to design and test – in all, over ten million dollars of investment. (ER001002.) Starting in 2006, FilmOn.TV Networks, Inc., a related entity to FilmOn X, began developing and testing a remote DVR technology. (ER000999.) FilmOn redesigned the technology in 2009, about a year after publication of *Cablevision* in the Second Circuit. (*Id.*) The FilmOn X technology employs technology found in several pending patents. (ER001002.)

FilmOn X's technology does not stream unlicensed content to the public in violation of the Copyright Act. That technology was specifically designed to comply with the requirements of the Copyright Act.

---

[6] Slingbox is a consumer device enabling users to transmit recorded broadcast content over the Internet to computers or mobile devices.

13

**1.     The Individual User of FilmOn X's Experience**

FilmOn X's technology enables consumers to create and access, from any Internet-enabled device, unique copies of the same free-to-air broadcast programming that they are able to access freely with traditional "rabbit ears."  To access the FilmOn X system, the user logs onto the FilmOn X website from an Internet-enabled device and selects a program or channel from a list of options that appear on the website.  (ER001014; ER000971.)

If the user picks a local channel to view, a signal is sent to the physical location where FilmOn X stores the hardware required to make transmissions of local over-the-air broadcasts.  (ER001014-15.)  That hardware includes individually assigned remote DVR mini-antennas.  (ER001193.)  That signal requests and causes to be assigned to the user his or her own individual mini-antenna that will pick up the over-the-air broadcast of the program the user wants to watch and relay a unique copy to the user's device.  (ER001093.)  While this is happening, the user sees a message on his or her device that states "Connecting antenna."  (ER001014-15.)  Once an antenna is assigned and connected, the programming becomes viewable on the user's device.  (ER001015.)

The user controls the viewing experience at all times and has the ability to stop, pause, close the application or switch channels.  (ER001013-15.)  This allows the user to watch "live" or "recorded" programming, the same way a user could

14

with a rooftop antenna and a DVR box.  (ER001197-98; ER001001; ER001096.)
The user views the program in the same way as if they picked up the broadcast
with a rooftop antenna and watched it on their television.  The commercial
programming being broadcast over the local signal is not interrupted in any way.
Thus, the technology merely enhances how individuals may watch over-the-air
broadcast content, which broadcast networks are required by law to provide for
free in exchange for their exclusive use of the public airwaves.

The only functional differences between FilmOn X's technology and the
technology involved in the traditional home viewing experience are: (1) The user's
private mini-antenna and digital recording device are remotely located; (2) FilmOn
X's Internet software allows users to tune their own mini-antenna over the Internet
instead of with a television remote control; and (3) FilmOn X enables a user to
view content selected and recorded by that user on any Internet-enabled device.

A FilmOn X user must exercise his or her volition to tune into, record and
then view, a copyrighted program transmitted over the public airwaves.
(ER001197-98; ER001093; ER001001.)   Only after a user has used FilmOn X's
technology to perform the steps of tuning and recording may that user transmit and
view a private, unique copy of the copyrighted program.  (*Id.*)  Each transmission
made by the consumer is private, from a single and unique copy particular only to
that consumer.  (*See* ER001001; ER001013-14.)

15

## 2.     The Technical Aspects of FilmOn X's Technology

FilmOn X's technology is based on mini-antenna DVR technology that –

along with routers, servers, adapters, tuners, transcoders and other equipment  –

allows users to receive "free-to-air" broadcast television programming.

(ER001193.)  Within each broadcast area, FilmOn X has a facility where it houses

thousands of mini-antennas, each about the size of a dime, on antenna boards.

(ER001093; ER001000.)  These mini-antennas are capable of picking up local

over-the-air broadcast content, and a hard drive database (the functional equivalent

of a DVR) is used to save unique copies of television content requested by

individual users.

The system is designed so that the mini-antenna DVR technology, and thus

the broadcast of the program, is controlled exclusively by each individual user.

(ER001197-98.)  After a user logs on to FilmOn X's website and selects content to

view or record, a request is sent to the antenna server to assign an individual mini-

antenna to that user.[7]  (ER001093; ER001001.)  Once the mini-antenna is assigned

to the user, and only then, the antenna starts to pick up and broadcast the requested

free over-the-air content.   (*See* ER001001; ER001013-14.)  That content is

transcoded into a format suitable to send and then view on that user's device.

---

[7] The server determines if the user is a "dynamic" user or a "static user", a
distinction based on the user's plan with FilmOn X.  (ER001093.)  Regardless, no
antenna is ever used by more than one user at a time.  (*Id.*)

(ER001013-14; ER001198; ER001001.)  That signal, whether the user watches it "live" or "recorded", can only be accessed and played by the individual user who requested it.  (ER001198; ER001014.)

At the individual user's request, a unique copy of the programming selected by the user is saved on the hard drive database for future viewing in a directory assigned to that user.  (ER001001.)  Each user has a unique directory not shared with any other user, in order to ensure each transmission of a program is unique.  (ER001013.)  No two "transmissions" over FilmOn X's platform are ever shared among users, and FilmOn X never selects what the user chooses to watch and/or record.  (ER001001; ER001012-13.)  Rather, FilmOn X's technology depends on its users' choices.  A user must select programming and then determine when that programming will be privately viewed by that same user.

The content transmitted to the user via the user's individually assigned antenna is unique.  (ER001014.)  FilmOn X's system creates a viewable copy of the content to display on the individual user's device who requested it, but no other user is capable of receiving that same copy.   (ER001198; ER001013-14.)  Only the user that requested the content, and not FilmOn X, is capable of playing it, recording it, fast forwarding or rewinding the content.  (ER001198; ER001013-14.)  Every step of the process by which the user ultimately ends up watching the free over-the-air content on their device maintains the individualized and one-to-one

17

nature of the programming between the user who requested it and the copy the user views.  (ER001198.)

## C.    The Harmful Effects of the Preliminary Injunction

FilmOn X deployed its new remote antenna DVR technology in August of 2012, about a month after a district court in the Southern District of New York found such a service complied with the Copyright Act.  *See Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397 (S.D.N.Y. 2012), *aff'd sub nom. WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 680 (2d Cir. 2013). (ER001000.)  Currently, the FilmOn X technology is capable of being offered in multiple geographic markets across the United States, including for example, Boston, Houston, Dallas, Chicago, Baltimore, Miami, Philadelphia, New York and California.  (ER001194.)  As a result of the injunction in this case, however, FilmOn X is prohibited from offering access to the Networks' copyrighted programming in all of these markets with the exception of New York.

Aereo, FilmOn X's major competitor, is not subject to any injunction. (ER001194.)  It currently operates in New York, Atlanta, Boston, Miami and Salt Lake City and has announced plans to expand to eighteen other major markets in the U.S.  (*See* ER001193; ER001203-06.)  Aereo is well-positioned to take advantage of the injunction in this case by seizing a greater market share in the industry for Internet streaming of free-over-the-air broadcast television.  (*See*

18

ER001194.)  As a result of this injunction, FilmOn X likely will lose significant

consumers, market share, talent, and sources of capital, which it will likely never

be able to recover.  (ER001194.)

## SUMMARY OF ARGUMENT

To obtain a preliminary injunction, a plaintiff must show a likelihood of

success on the merits, likely irreparable harm, that the balance of equities tips in its

favor, and that such an injunction serves the public interest.  *Winter v. Natural Res.*

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The Networks did not satisfy any of

these necessary elements.

The district court wrongly concluded that the Networks were likely to

succeed on the merits of their claim that FilmOn X violates their exclusive public

performance rights in their copyrighted works, because the district court adopted

the erroneous construction of the Transmit Clause advanced by the Networks and

rejected by the Second Circuit in *Aereo*.  The district court held that FilmOn X

publicly performed copyrighted works as defined by the Transmit Clause because

the service "made available" copyrighted performances to "any member of the

public who accesses the FilmOn X service."  (ER001113.)  Although the district

court purported to reach that conclusion by its own independent interpretation of

case law and statutory text, the court noted its explicit rejection of *Aereo*, stating

"the [district court] respectfully disagrees with *Aereo's* interpretation of the

19

Transmit Clause for the reasons set forth in *BDCS* and in Judge Chen's dissent."
(ER001113; *see also* ER001116.)  The district court got the law wrong: the Second
Circuit's well-reasoned interpretation of the Transmit Clause in *Aereo* is supported
by the statutory text, legislative history, relevant case law and the policy
considerations underlying the Copyright Act.

Through FilmOn X's technology, a user may remotely record and privately
view television programming that every member of the public indisputably has the
right to record and view.  The technology features two essential components.  First,
it features thousands of mini-antennas, each of which is assigned to a unique user.
No mini-antenna is simultaneously shared by users.  Second, FilmOn X provides
each user with a dedicated hard drive, on which the user's selected programming is
recorded by the user for subsequent viewing.  FilmOn X remotely hosts the same
type of technology that already exists in millions of homes across the United
States.  That technology, the television, antenna and DVR, has always been
declared legal by Congress and the courts.  Because the consumer can use FilmOn
X's mini-antenna technology to make private performances not prohibited by the
Transmit Clause of the Copyright Act, the Networks did not – and cannot –
establish a likelihood of success on the merits.[8]

---

[8] The district court's erroneous interpretation of the Transmit Clause caused the
district court to make other erroneous factual and legal conclusions, such as the
conclusion that FilmOn X technology is "hardly akin to a user stringing up a

The district court also wrongly concluded that the three other injunction factors favored the Networks.  They did not and do not.  The Networks did not demonstrate likely irreparable harm, because FilmOn X has not infringed any of the Networks' copyrights (and thus the Networks have not suffered an injury).  The only evidence of irreparable harm the Networks offered consisted of impermissibly speculative, hypothetical monetary harm.

The Networks also cannot establish that the balance of harms tips in their favor. The district court's decision as to this element was premised upon its erroneous finding of a likelihood of success on the merits.  The injunction threatens the very viability of FilmOn X.  The Networks face no such harm; in fact, FilmOn X offers the Networks additional advertising market share, enabling additional users access to Network programming.

The district court also erred in holding that the injunction serves the public

television antenna on a roof" and the conclusion that "the aggregation of several kinds of technology does not avoid the Copyright Act."  (ER001115.)  On the appropriate interpretation of the statute, as set forth in the *Aereo* opinion, FilmOn X technology *is* akin to a user putting an antenna on a roof, because like the individual antenna, the FilmOn X technology enables an individual user to privately perform a free-to-air work.  *See WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 693 (2d Cir. 2013).  Similarly, the aggregation of technology like FilmOn X's that enables private performances does not violate the Transmit Clause language aimed at future technologies that enable *public* performances of copyrighted works.  Cable television companies do *not* rely on technology that allows users to access individual unique copies of works and are therefore subject to the relicensing schemes enacted by the statute.  Neither of these erroneous conclusions provides support for the district court's erroneous interpretation of the Transmit Clause, but rather flow as a matter of course from that incorrect interpretation.

interest.  The public has an absolute and unfettered right to receive, copy and watch broadcast programming at any time.  In fact, the entire premise of the statutory scheme related to free over-the-air television aims to ensure that individuals have access to that programming.  Moreover, technological innovation in such areas as cloud computing, which involves remote storage of and access to copyrighted material, serves the public interest.

FilmOn X should not be enjoined from offering consumers the full-range of its technology everywhere except the Second Circuit.  Even if this Court concludes the injunction is not based on mistaken legal and factual conclusions, the injunction overreaches in its near-nationwide scope and directly and unnecessarily violates principles of comity that provide different jurisdictions the autonomy to decide a disputed legal issue based on case law within those jurisdictions.  The district court's injunction should be reversed.  FilmOn X should once again be allowed to enable its users to privately transmit over-the-air broadcast content everywhere that it operates.  Even if the injunction were not reversed entirely, it should be limited in scope to the D.C. Circuit.

**ARGUMENT**

**I.    Standard Of Review**

This Court "reviews a district court's weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of

discretion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006). However, any legal conclusions, upon which a district court

relies, are reviewed *de novo*. *Id.* Findings of fact are reviewed under a clearly

erroneous standard. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir.

1998).

## II.    The Networks Did Not Establish A Likelihood Of Success On The Merits

In *Cablevision* and more recently *Aereo*, the Second Circuit correctly

applied the plain language of the Transmit Clause to protect a right Congress and

the courts have always protected – the right of private performance. *See Aereo*,

712 F.3d 676 (2d Cir. 2013); *Cablevision,* 536 F.3d 121 (2d Cir. 2008). The

Networks have consistently fought to curtail that right each time innovation

rendered content more accessible to private individuals.[9] Predictably, they have

---

[9] The Networks' response to innovation as a threat to their rights is nothing
new. Indeed, the Networks have a decades-long history of opposing nearly every
technological innovation rendering content more accessible to consumers. Almost
all of those technologies opposed are now widely accepted and unobjectionable,
even to copyright holders. For instance, when Sony first developed the Betamax
VCR, enabling consumers to record and time shift television program, owners of
television and film copyright owners sued arguing infringement. *See Sony Corp.
of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984). They lost (*id.*),
and the VCR became an accepted and widely used product. Later, as DVR
technology came to supplant VCRs, the Networks again acted to prevent
consumers from using DVR technology. *See Paramount Pictures Corp. v.
ReplayTV*, 298 F. Supp. 2d 921 (C.D. Cal. 2004). The Networks also opposed
Remote Service DVR technology – and lost. *See Cablevision,* 536 F.3d 121. The
Networks unsuccessfully sought to block innovation improving DVR
technology. *See, e.g., Fox Broadcasting Company, Inc. v. Dish Network, L.C.C.*,
723 F.3d 1067 (9th Cir. 2013).

done so again in this case.

Here, the Networks offer a strained, illogical reading of the Transmit Clause, again attempting to prevent individuals from exercising the right of private performance. The district court erred in adopting the Networks' incorrect interpretation of the Transmit Clause. (*See* ER001090.) This Court should reject that reading and give effect to the plain language of the Copyright Act. That Act provides that transmissions from a unique source to a single user, such as those made by users of FilmOn X, are private performances. Such private performances do not violate the Copyright Act and are not a valid basis for injunctive relief. Accordingly, this Court should reverse the ruling of the district court that the Networks demonstrated "a likelihood of success on the merits of their public performance theory of liability."[10] (ER001090.)

### A. *Aereo* And *Cablevision* Properly Interpret The Transmit Clause

This Court should follow the well-reasoned opinions from the Second Circuit. The Transmit Clause provides that transmissions, such as those enabled by FilmOn X, are private performances. FilmOn X's technology merely enables individual users to record and view their own unique copies of free-over-the-air broadcasts—a right that falls squarely within the realm of private performance.

---

[10] The district court's finding of likelihood of success was limited to the Networks' theory of public performance. Accordingly, the likelihood of success as to that theory only is before this Court.

24

In crafting the Transmit Clause and distinguishing between public and private transmissions, Congress balanced potentially competing policy aims. The Transmit Clause both encourages widespread public access to broadcast programming (by allowing private transmissions) and protects the expression of content owners (by prohibiting public transmissions). *See* H.R. Rep. 94-1476, at 65 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678. Thus, while content owners have the exclusive right to "perform the copyrighted works *publicly*," private (as opposed to public) performances are exempt from copyright liability. 17 U.S.C. § 106(4) (emphasis added).

In determining whether a performance is public or private in nature, the Transmit Clause focuses on whether the "transmi[ssion] . . . of a performance or display of the work" is made "to the public . . . ." 17 U.S.C. § 101. It further provides that the mere fact that "members of the *public capable of receiving the performance* or display receive it in the same place or in separate places and at the same time or different times" is irrelevant in determining whether a performance is public or private. *See id.* (emphasis added).

In *Cablevision*, the Second Circuit applied the text of the Transmit Clause to a remote storage DVR ("RS-DVR") system. In that case, the RS-DVR system allowed customers who did not have a stand-alone DVR in their homes to record and store cable programming on central hard drives housed and maintained by

25

Cablevision at a remote location. *Cablevision*, 536 F.3d at 125. The Second

Circuit explicitly rejected the district court's conclusion that the RS-DVR

technology violated the Transmit Clause's right of public performance, finding that

system "only makes transmissions to one subscriber using a copy made by that

subscriber" and therefore "the universe of people capable of receiving an RS-DVR

transmission is the single subscriber whose self-made copy is used to create that

transmission." *Id.* at 137.

Analyzing Cablevision's system under the Transmit Clause, that court

reasoned that "the *transmit clause* directs us to identify the potential audience of a

given transmission, *i.e.*, the persons 'capable of receiving' it, to determine whether

that transmission is made 'to the public.'" *Id.* at 139 (emphasis added). Because

each RS-DVR transmission was "made to a single subscriber using a single unique

copy," the transmission was private, not public. *Id.* at 139.

More recently, on April 1, 2013, in *Aereo,* the Second Circuit applied

*Cablevision* to a case involving a technology relevantly similar to FilmOn X's

technology. The Second Circuit explained the technology as follows:

> When an Aereo customer elects to watch or record a program . . .
> Aereo's system creates a unique copy of that program on a portion
> of a hard drive assigned only to that Aereo user. And when an
> Aereo user chooses to watch the recorded program . . . the
> transmission sent by Aereo and received by that user is generated
> from that unique copy. No other Aereo user can ever receive a
> transmission from that copy. Thus, just as in *Cablevision*, the
> potential audience of each Aereo transmission is the single user

26

who requested that a program be recorded.

*Aereo*, 712 F.3d at 682-83.  Accordingly, the Second Circuit ruled that Aereo's

technology merely enables the right of private performance and does not infringe

the content owners' public performance rights.  *Id*. at 696. [11]

As the district court recognized, FilmOn X's technology is the same in all

legally meaningful respects to the technology at issue in *Aereo*.  (ER001092

(stating that the systems used by FilmOn X and Aereo "are essentially the same,

and the parties agree that there are no legally meaningful differences.").)

By design, FilmOn X's technology is controlled by individual user choices

and individual requests to receive programming.  (ER001197-98.)  Each

transmission made by the consumer is private, from a single and unique copy

uniquely to that consumer.  (ER001198.)  FilmOn X's technology works as

follows: (1) the viewing experience is initiated by the user and based on the use of

mini-antennas; (ER001093; ER001001); (2) each user has his or her own unique

antenna and unique directory containing the data they selected to record;

(ER001001; ER001013); and (3) each user has the ability to control that data,

including to stop, pause, close the application or switch channels (ER001013;

---

[11] The Networks unsuccessfully petitioned the Second Circuit for *en banc* review. *Aereo*, 712 F.3d 676, 680 (2d Cir. 2013), *pet. en banc denied*, 722 F.3d 500 (2d Cir. 2013).  That petition was denied.  *Id.*  The Supreme Court also declined the Networks' requests to review *Cablevision*.  *Cablevision*, 536 F.3d 121 (2d Cir. 2008), *cert. denied* 557 U.S. 946 (2009).

ER001198).  The unique and dedicated nature of this technology relevantly

parallels the technology at issue in *Aereo* and endorsed in the *Sony* and *Cablevision*

decisions. Accordingly, transmissions made by users of FilmOn X's technology do

not constitute a public performance of any copyrighted work.  Rather, that

technology is used by consumers to make private performances consistent with

what is allowed under the Transmit Clause.

### B.    Consumers Use FilmOn X's Technology To Make Only Private Transmissions, Which Do Not Violate The Transmit Clause

The right of individuals to use technology to record over-the-air broadcasts

as a matter of personal convenience is a long-standing and fundamental principle

of modern copyright jurisprudence.  This principle supports permitting FilmOn X

to operate as it did before the preliminary injunction, *i.e.*, providing technology

that enables its customers to receive, copy and watch at their convenience, their

privately-made copies of over-the-air broadcast content.

The American public has the right to access free over-the-air broadcasting.

Since the enactment of the Radio Act of 1927, it has been a central tenet of

American communications policy that a license to use the valuable resource of the

public airwaves carries with it the obligation to operate in the public interest,

convenience, and necessity.  Pub. L. No. 69-169, 44 Stat. 1162 (1927); *see also* 47

U.S.C. § 303 (directing the Federal Radio Commission to grant licenses to the

public airwaves in the "public convenience, interest, or necessity.").  Under the

Communications Act of 1934, the networks are granted licenses to operate only if the "public convenience, interest, or necessity will be served thereby."  47 U.S.C. § 307(a).  The Networks are required to serve the needs and interests of the communities to which they are licensed.  If a broadcaster fails to meet its public obligations, the Federal Communications Commission can decline to renew its license.  47 U.S.C. § 309(k).[12]

The Supreme Court has held that "preserving the benefits of free, over-the-air local broadcast television" is an important government interest.  *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) (holding that broadcast stations are required to make their service freely available to the public).  FilmOn X's technology merely enhances the individual's ability to watch the same free over-the-air broadcast content that the American public is entitled to receive in accordance with the public interest recognized by Congress and the Supreme Court.

Moreover, in its seminal *Sony* decision, the Supreme Court held that Sony

---

[12] As over-the-air broadcasters, networks receive special statutory rights, including: The right to demand carriage by cable systems, 47 U.S.C. § 534; guaranteed placement on the "basic tier," 47 U.S.C. § 543(b)(8); and the legal right to "consent" to the retransmission by cable systems of programming they may not own the copyright to, 47 U.S.C. § 325(b).  In exchange for these rights – and in recognition of the fact that the number of broadcast licenses is limited – the networks have an obligation to serve the public.  *Red Lion Broad. Co. v. FCC*, 395 U.S. 367 (1969) (citing S. Rep. No. 86-562, at 8-9 (1959)) ("[B]roadcast frequencies are limited and, therefore, they have been necessarily considered a public trust.").

was not liable for secondary infringement for sales of the Sony Betamax, because consumer recording and playback of television programs was "fair use" and did not violate the Copyright Act. *Sony Corp. v. Universal Studios, Inc.*, 464 U.S. 417, 455-56 (1984). Moreover, the Supreme Court stated that such use served the public interest by increasing access to television programming, an interest that "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Id.* at 425 (citing *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 102 (1973)). "Fair use," as described in *Sony*, is, of course, not limited to the Betamax; rather, it applies to any technology enabling the user to record and playback information available on the public airwaves.

FilmOn X's technology performs the same function as the Betamax in *Sony*: it allows the consumer to record and playback broadcast programming through the convenient medium of the Internet. (*See* ER001001, ER001012-15.) There is no relevant difference between FilmOn X technology and that of a traditional home video recorder, which *Sony* deemed a non-infringing fair use. *Cablevision*, 536 F.3d at 132-33.

## C. The District Court's Interpretation Of The Transmit Clause Is Flawed

The district court rejects the sound reasoning of *Cablevision* and *Aereo*, and misinterprets the plain language of the Transmit Clause. Its opinion is based on the

30

faulty premise that each individual transmission of a performance of an underlying work should be aggregated into what is effectively a single public performance. This premise stands at odds with the express language of the statute, the legislative history, and existing case law. Indeed, it is hard to see, in view of the district court's interpretation that all performances of an underlying work should be aggregated, how a purely private transmission of a performance of a work could exist at all.

1.    The District Court Misreads The Plain Text Of The Transmit Clause

The fundamental error in the district court's decision is that it blurs the crucial distinction, founded in the text of the Copyright Act, between a "work" and a "performance of the work." The Transmit Clause clearly distinguishes a "performance or display of the work" from "the work." *See* 17 U.S.C. § 101 (stating that "[t]o perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . to the public"). Congress specified that "to transmit a performance of a work" is the performance at the heart of the Transmit Clause. *See id.* Thus, under the Transmit Clause, the key inquiry is not whether members of the public receive the same work, but whether they receive the same performance.

But rather than focusing on whether a particular transmission of a performance was made to the public as required by the Transmit Clause, the

31

district court found copyright infringement based on the aggregation of separate performances of the same underlying work.  The district court reasoned that it should equate the relevant "performance" with "an original over-the-air broadcast of a work copyrighted by one of the Plaintiffs[.]"  (ER001113.)  Only by conflating a performance with the underlying work was the district court able to conclude that "FilmOn X performs the copyrighted work publicly as defined by the Transmit Clause," because FilmOn X "mak[es] available Plaintiffs' copyrighted performances to any member of the public who accesses the FilmOn X service . . . ."  (ER001113.)

The district court's reading of the Transmit Clause contravenes the most basic principles of statutory construction and, to accept it, threatens the very concept of private performance.  The district court ignores the statutory focus on the act of transmitting a performance of the work and renders the words "to transmit a performance" mere surplusage in the statute.  *See* 17 U.S.C. § 101.  The statutory structure—focused on the capability of receiving "the performance," using the definite article and the singular form—requires a court to analyze each transmission of a performance separately, not in the aggregate.  *See id.* (referring to "members of the public capable of receiving the performance").  That is why the Transmit clause "speaks of people capable of receiving a particular 'transmission' or 'performance,' and not of the potential audience of a particular 'work.'"

32

*Cablevision*, 536 F.3d at 134.

Under the district court's reasoning, any company that provides consumers with access to equipment (such as a VCR, DVR, RS-DVR, or any number of cloud services) that records copyrighted works for future private viewing could be held liable for copyright infringement. Indeed, the district court reasoned that "every broadcast of a television program (whether cable, satellite, over-the-air, over the Internet, or otherwise) could be described as 'generated from the same copy'—the original source." (ER001113, ER00115)

### 2.      The Legislative History Does Not Support The District Court's Reading

The district court's focus on the underlying "work" rather than the specific "performance" negates congressional intent to preserve private performances from the copyright owners' control. Congress has acted, in each revision of the Copyright Act, to preserve those private rights. Nowhere in the statute is any evidence of congressional intent to aggregate separate private transmissions of performances of the same "work" into a single performance "to the public."

As the *Sony* Court held, the Copyright Act "has never accorded the copyright owner complete control over all possible uses of his work." *Sony*, 464 U.S. at 432 (footnote omitted). Congress always has maintained the individual's right to privately perform copyrighted works. The Copyright Acts of 1856, 1897 and 1909 explicitly preserved these private rights by confining the performance

33

right to public performances. *See* Copyright Act of 1856, 11 Stat. 138 (1856); Copyright Act of 1897, 29 Stat. 481 (1897); Copyright Act of 1909, §1(c)-(e), 35 Stat. 1075 (1909). Congress deliberately carried forward this policy imperative from these prior Acts into the 1976 Copyright Act by including within the Transmit Clause only transmissions made "to the public." As *Cablevision* reasoned, "if it did not, Congress would have stopped drafting that clause after 'performance.'" 536 F.3d at 136.

The district court cited the House Report for the 1976 Act as support for its contrary interpretation of the Transmit Clause. (ER001110-11.) While this report states that the definition of "transmit" "is broad enough to include all conceivable forms and combinations of wires and wireless communications media," nothing in the legislative history suggests that Congress intended to eliminate the requirement that a transmission be made to the public. To the contrary, the House Report confirms that, in determining whether a performance is public or private, the legislative focus is on whether the particular transmission of a performance is to the public. *See* 1976 U.S.C.C.A.N. at 5678 (stating that "[u]nder the bill, as under the present law, *a performance made available by transmission to the public at large* is 'public' even though the recipients are not gathered in a single place") (emphasis added). Indeed, the legislative record as a whole shows that Congress understood that its definition of "transmission" limited the ability of copyright

34

holders to prevent private transmissions. *See, e.g.*, Register of Copyrights, Copyright Law Revision, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, 89th Cong., 1st Sess., at 22 (Comm. Print 1965) (stating that "[t]he definition of 'publicly' … would, in general, exempt private performances and exhibitions from the copyright owner's control, and the limitations in the remaining sections of the chapter … would further narrow the scope of his rights.").

Moreover, the district court was led astray by the Networks' discussion of the legislative history behind the compulsory licensing scheme for cable companies—an entirely different statutory section that is inapplicable. The Networks previously argued and the district court concluded that the 1976 Act was a "direct response" (ER001109) to the Supreme Court's decisions in *Fortnightly Corp. v. United Artist Television, Inc.*, 392 U.S. 390, 391 (1968) ("*Fortnightly*"), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974) ("*Teleprompter*"). This is only partially correct and is wholly misleading. In the wake of *Fortnightly* and *Teleprompter*, Congress enacted a specific compulsory license and royalty scheme for public retransmission by cable companies. The compulsory license and royalty scheme has nothing to do with the Transmit Clause's distinction between private and public performances, and neither does the House Report language quoted by the Networks describing cable systems

35

(which retransmit a single source to many thousands of households) as "commercial enterprises." (*See, e.g.*, ER000266.)  In fact, the relevant language of the Transmit Clause at issue in this action was written before *Fortnightly* and could not have been a response to it.

Importantly, Congress did not repudiate or circumscribe traditional fair use rights in the 1976 Act.  The legislative history shows that Congress was extremely interested in preserving those rights:

> Specifically, it is not the intention of the Committee to restrain the home recording, from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing it or otherwise capitalizing commercially on it.

H. Rep. No. 487, 92d Cong., 1st Sess. 7, reprinted in (1971) U.S. Code Cong. & Admin. News, pp. 1566, 1572.  The use of the word "private" above is significant and parallels conceptually the congressional intent to exempt private performances from liability under the Transmit Clause.  Congress was adamant that viewers be able to privately record and transmit the Networks' programming.

Unlike cable companies which retransmit a single performance to many thousands of households, FilmOn X's service enables individual users to make their own programming decisions.  The district court's focus on FilmOn X's status as a "commercial entity" is misplaced and leads to absurd results.  Nothing in the text of the Copyright Act or in the legislative history precludes the possibility that

36

a consumer could use equipment supplied by a commercial entity to enable a private performance, or that the technology provider should be subjected to liability. As *Sony* and *Cablevision* make clear, a technology provider such as FilmOn X cannot be liable for a consumer's personal recording and viewing, merely by providing the means to engage in that private activity, just as a manufacturer or retailer could be liable for selling a television, an antenna, or a VCR or DVR.

Copyright law does not and should not distinguish between a company that supplies technology for the home and a company that supplies functionally equivalent technology in the cloud. Functionally, the FilmOn X system operates similarly to a television with a digital antenna and a DVR, which may be located in an individual's living room or anywhere else the individual may choose. In the case of FilmOn X, the digital antenna and DVR are remotely located. The television screen may be a computer or handheld device. Just as the manufacturers of televisions, digital antennas and set-top boxes available at Best Buy are not liable for copyright infringement based on users' activities, FilmOn X is not liable. Sony, for example, sells hundreds of thousands of televisions and DVRs, but it is not liable for any public performance, even if every Sony user were to record and watch the same copyrighted broadcast. Each Sony user has the independent right to privately perform copyrighted material – those users cannot be aggregated to

37

convert their separate private performances into a public performance.  Nor may

FilmOn X users' private performances be aggregated to create a public

performance.[13]  FilmOn X is not liable for any infringement based on the actions of

various individuals, each of which employs uniquely assigned FilmOn X

technology.

Further, based on the ruling of the district court, a consumer who accesses a

legally purchased and stored  Rolling Stones album on Apple's iCloud service

would violate the Transmit Clause upon playing that album on various devices.

Similarly, if multiple users stored distinct copies of the same Rolling Stones album

in the cloud and then those users separately listened to those independent copies,

the district court would find those private performances to be public.  *Cablevision*

expressly addresses this point:

> [t]he implication of this theory is that to determine
> whether a given transmission of a performance is 'to the
> public,' we would consider not only the potential
> audience of that transmission, but also the potential
> audience of any transmission of the underlying 'original'
> performance. . . . [T]his view obviates any possibility of
> a purely private performance.

---

[13] The aggregation of private performances is particularly troubling in the broader
context of cloud computing.  In that context, users routinely store private copies of
copyright material in "the cloud," a remote, generally unspecified, location.  Cloud
computing users may then transmit those unique copies of that material to render a
private performance.  If those transmissions were somehow aggregated to convert
private performances into public performance, the cloud computing industry would
be virtually undone.

38

536 F.3d at 136.  This Court should follow *Cablevision* and *Aereo's* interpretations of the Transmit Clause, and reject the district court's flawed reasoning.

Because FilmOn X's service is consistent with the right of private performance and the Networks cannot prove a likelihood of success on the merits, this Court should reverse and vacate the preliminary injunction.

## III.    <u>The Networks Failed To Demonstrate Irreparable Harm</u>

The district court erred in concluding that the Networks demonstrated irreparable harm.  The district court found that the Networks demonstrated four categories of irreparable harm: (1) harm to their ability to negotiate with advertisers; (2) damage to their contractual relationships and ability to negotiate with authorized retransmitters; (3) interference with their proprietary and licensed online distribution avenues; and (4) the loss of control over the distribution and quality of their copyrighted programs.  (ER001119.)  Each of these purported harms, however, assumes that FilmOn X's technology and service infringed the Networks' copyright.  Because FilmOn X's technology and service lawfully enable private performances and other protected fair use rights, the Networks have not been deprived of any property right or other interest.  Thus, they cannot show irreparable harm.

Moreover, the Networks' supposed "evidence" of irreparable harm consists entirely of speculative statements about potential hypothetical harms.  "In [this]

39

Circuit, there is a high standard to establish irreparable harm sufficient to justify injunctive relief." *GEO Specialty Chemicals, Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013). A plaintiff "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.1985) (per curiam). That standard is not met here.

The Networks and the district court relied almost exclusively on the self-serving and speculative declaration of Fox Cable Networks executive Sherry Brennan (the "Brennan Declaration") to demonstrate irreparable harm. (*See, e.g.*, ER001117-18.) For example, paragraphs 13-15 of the Brennan Declaration vaguely describe an outlandish monetary harm which Brennan claims will occur when FilmOn X subscribers cancel their subscriptions with cable providers over an unspecified period of time, which over time will lower cable providers' revenue, which in turn will lead to cable providers paying less for retransmission rights, ultimately ending in the cessation of programming for 54 million viewers. (ER000545-57.) That prolonged hypothetical and wholly speculative causal chain does not constitute immediate, irreparable injury. In paragraph 16 of her declaration, Ms. Brennan admits she is engaged in pure speculation: "While *it is impossible to know* how much revenue the Broadcast Companies will lose when they negotiate retransmission agreements … I am certain … [FilmOn X's

40

technology] will be a factor in such negotiations." ((ER000547) (emphasis added).)  The district court and the Networks nowhere explain the logical leap from FilmOn X's technology being a potential "factor" in hypothetical future negotiations to immediate irreparable injury.  Brennan also admits in paragraph 22 that the Networks are nowhere near certain to incur imminent injury from the alleged infringing conduct, merely stating that FilmOn X "will likely damage the Broadcast Companies' relationship with its legitimate licensees." (ER00549.)  The Networks' asserted irreparable harms all relate to their generalized fear of lost revenues and market positions and are based on pure speculation.  (ER000273-75.)  These types of consequences are recognized as economic losses (as opposed to irreparable harms) in the District of Columbia Circuit.  *See GEO Specialty Chemicals, Inc.*, 923 F. Supp. 2d at 151; *see also Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) ("[c]ourts within the Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share.").[14]

---

[14] The district court cited a decision from the Federal Circuit as support for its claim that the likelihood of price erosion and loss of market position are evidence of irreparable harm.  But that decision arose in the context of a patent infringement case where the plaintiff was "entitled to a rebuttable presumption of irreparable harm . . . ."  *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1367-68 (Fed. Cir. 2001).  There is no such presumption in a copyright case.  The Supreme Court has held that a court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits.  *See eBay,*

Here, money damages would be sufficient to redress any harm proven at trial. Lost advertising revenue, if any, should be quantifiable by the time of trial. Also, the district for the District of Columbia recognizes that "the possibility that adequate compensatory or other corrective relief will be <u>available at a later date</u>, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy,* 454 F.3d 290, 297–98 (D.D.C. 2006) (citation omitted) (emphasis added).

The Networks asserted substantially similar claims of irreparable harm in the *Aereo* case, where the district court refused to enter a preliminary injunction and the Second Circuit affirmed its decision. Even in the California case against FilmOn X (which is pending appeal to the Ninth Circuit), these arguments only caused the district court to issue a much more limited injunction than that issued here. *See Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397 (S.D.N.Y. 2012), *aff'd sub nom., Aereo*, 712 F.3d 676, 680 (2d Cir. 2013); *BDCS*, 915 F. Supp. 2d at 1147. Finally, and most importantly, the Networks are still thriving, successful and profitable corporations. If the Networks' claims bear out over time, their current assertions as to reputational harm or lost goodwill (if any) likewise would have some factual support or basis by the time of trial. At present, those assertions are conjecture, not evidence of irreparable harm.

---

*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-93 (2006).

Such speculative and inconsistent testimony does not establish the immediate and irreparable harm necessary to support issuance of a preliminary injunction.

## IV.  **The Balance of Hardships Favors FilmOn X**

The district court declined to balance the relative hardships of the parties. Instead, it held that since FilmOn X's conduct constituted an infringing activity, it had no right to "complain of the harm it will suffer" because of the injunction. (ER001120.)  But FilmOn X's technology does not infringe the Networks' copyrights.  Accordingly, the district court's failure to properly weigh FilmOn X's hardships against the Networks' was in error.  *See, e.g., Health Ins. Ass'n of Am. v. Novelli*, 211 F. Supp. 2d 23, 33 (D.D.C. 2002) (denying plaintiff's request for preliminary injunction for copyright infringement because defendant and other parties would likely suffer harm); *see also Belushi v. Woodward*, 598 F. Supp. 36, 37 (D.D.C.1984) (when seeking a preliminary injunction, "plaintiff must establish that defendants will not be unduly harmed by the issuance of relief").

A comparison of the hardships shows that the balance favors FilmOn X. FilmOn X has far fewer resources than the Networks.  Further, FilmOn X has devoted a significant amount of those resources to the development of its remote mini-antenna and DVR technology.  (ER001002.)   Having made such commitments, FilmOn X may not recover from the harm caused by a disruption to

43

its business.  The risk of irreparable harm to FilmOn X is especially great in light of the fact that FilmOn X's main competitor, Aereo, is marketing a competing service.  (*See* ER001193-94, ER001203-06.)  Because FilmOn X cannot compete on an equal footing with Aereo in the nascent market for these Internet services, it is highly probable that FilmOn X will suffer a permanent loss in market share, customer loyalty, and damage to its brand by the nearly nationwide injunction in this case.  (*See* ER 001194.)  On that basis, the balance of hardships tips towards FilmOn X.  *See, e.g., Belushi v. Woodward,* 598 F. Supp. at 37 (D.D.C.1984) (denying to grant plaintiff a preliminary injunction in a copyright infringement case because, although plaintiff demonstrated a likelihood of success on the merits of her claim, defendants would have lost a substantial amount in sales and legal remedies were available to plaintiff to adequately address her injuries.); *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491-92 (2d Cir. 2002) (affirming denial of preliminary injunction due to serious concerns that Rosetta would go out of business balanced against Random House's alleged loss of goodwill).

The balance of hardships here resembles the balance of hardships in *Aereo*. There, the district court found that as a small business, Aereo would suffer substantial harm if the injunction was entered, including the loss of the labor and capital used to develop and launch its system.  *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d at 402.  The court also held that the proposed

injunction would "diminish or destroy a variety of [Aereo's] intangible resources," by employee loss and the inability to raise additional capital, among other things. *Id*. Further, the court found the injunction would harm Aereo's competitive advantage in developing an innovative product, undermine its substantial investment in launching new products and cause a loss of customers and goodwill. *Id*. at 403. All of the same factors considered in *Aereo*, apply here. Having deprived FilmOn X of the ability to offer its technology to consumers in the Ninth Circuit, the injunctions have already proved a substantial hardship to FilmOn X and threaten the survival of its nascent and innovative business. (*See* ER001193-94, ER001203-06.)

The Networks have not put forth any non-speculative, non-hypothetical evidence concerning their purported injury. When weighed against the threat to FilmOn X's business posed by an injunction, the balance of hardships tips decidedly in favor of FilmOn X.

## V.    <u>The District Court's Rulings Harm The Public Interest</u>

The district court erred in determining that the public interest favors granting an injunction, because the public interest in upholding copyright protections favored the Networks. (*See* ER001121.) But here, there is no valid copyright protection to uphold. The Transmit Clause's prohibition on transmitting copyrighted works does not apply to technologies that enable private

45

performances, such as FilmOn X.

The injunction harms the public interest.  The injunction in this case undercuts the public policy Congress has specifically advocated – the protection of the public's right to engage in private performance.  The district court's rulings prevent individuals from viewing private transmissions of publicly available broadcast programming in an important new and convenient way.

The injunction also undermines the public interest in technological innovation.  The underlying aim of copyright law is to balance the protection of artistic expression with technological innovation.  *See, e.g., Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.,* 545 U.S. 913, 928 (2005) (The more artistic protection favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff.).  Here, the district court's injunction deprives individuals of a right to use technology to access content to which they already have rights.  To protect against such outcomes, federal courts generally favor the technology innovator over the copyright holder when considering public interest.  *See, e.g.,  Softman Prods. Co., LLC v. Adobe Systems, Inc*., 171 F. Supp. 2d 1075, 1091 (C.D. Cal. 2001) ("A system of 'licensing' which grants software publishers this degree of unchecked power to control the market deserves to be the object of careful scrutiny.").

The injunctions also undercut innovators and investors in FilmOn X and its

competitor Aereo who relied on *Cablevision*'s guidance regarding what constitutes a private performance in designing and launching technologies and services to the public. The potential obstacles to innovation posed by the injunction and the district court's construction of the Transmit Clause extend well beyond FilmOn X's technology and service. For example, numerous technology companies like Google and Apple offer cloud storage services that allow consumers to store their music and other content remotely in the cloud, so that it may be accessed when, where, and how the consumer chooses. Under the district court's construction of the Transmit Clause, these new technologies would potentially enable improper public transmissions of copyrighted work in the same way as FilmOn X.

Commentators and media advocacy groups have shown a strong interest in protecting broad and convenient consumer access to media, as reflected in *amicus* briefing submitted by the Electronic Frontier Foundation and Consumer Federation of America in support of FilmOn X in its Ninth Circuit Appeal. (*See* ER001025-27.) Also, because the principles articulated in the Transmit Clause, as explained in *Cablevision*, are so critical to consumers' rights and innovation, Computer & Communications Industry Association filed an amicus brief "in support of reversal" setting forth arguments in support of *Cablevision* and its progeny. (*See* ER001025-27.) Many of those same organizations intend to support this brief.

47

## VI.   At A Minimum, The Scope Of Any Injunction Should Be Limited To The D.C. Circuit

Even if this decision is otherwise affirmed, the injunction should be limited to the D.C. Circuit.  The scope of the current injunction (nationwide except as to the Second Circuit) creates real and potential conflict with the law of other jurisdictions, ignores the principle of comity, and places defendants at a stark, unfair competitive disadvantage with their main competitor, Aereo, which is free to offer its product in the same geographic markets in which FilmOn X has been enjoined.   (ER001203-06.)  The Networks' strategic decisions to sue only FilmOn X and not Aereo in the D.C. Circuit should not determine which company wins or loses in this technology market.  The district court below erred in its interpretation of 17 U.S.C. section 502(b).  While noting that section 502(b) "commands a nationwide injunction," (ER001121) the court also correctly observed that such nationwide injunctions are not appropriate or desirable in all circumstances, holding that "the DC Circuit has recognized that in some cases comity may require courts to limit the scope of injunctions."  (ER001121-22.)  The district court explicitly quoted language from *Holland v. National Mining Association*, 309 F.3d 808, 815 (D.C. Cir. 2002) explaining that principles of comity required the court to appropriately craft and limit injunctions that bear on businesses with national scope: "[W]e clarify that an injunction issued in the D.C. Circuit can bind the Commissioner only with respect to coal companies [that] were not already covered

48

by the Eleventh Circuit's injunction." (ER001122.) Indeed, by exempting the Second Circuit from the injunction, the district court recognized that principles of comity must trump any language in Section 502(b). (ER001122 ("In some cases comity may require courts to limit the scope of injunctions.").)

Yet in only exempting the Second Circuit, the district court did not give sufficient weight to the comity interests in this case. The litigation between these parties is occurring on numerous fronts; this case is only one of several copyright actions filed by major television networks against FilmOn X and Aereo in jurisdictions across the country. Based on materially identical facts, the Second Circuit and the District of Massachusetts have ruled against the Networks, and the Central District of California and the district court below reached the opposite result, ruling in favor of the Networks. Appeals have been filed in the First and Ninth Circuits (and has already been decided in the Second Circuit). Courts in other circuits should have the opportunity to decide for themselves whether the technology used by FilmOn X and Aereo is legal or not. For this reason, the district court in California correctly limited its injunction against FilmOn X to the Ninth Circuit, reasoning that "[i]f other circuits do not have law that conflicts with this decision, they might adopt such law when presented with the choice." *BDCS*, 915 F. Supp. 2d at 1148 (emphasis added).

In analogous circumstances, courts in this Circuit and elsewhere have been

49

respectful of the need for the law of different jurisdictions to develop. This Circuit has cautioned against "[a]llowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit," which would "squelch the circuit disagreements that can lead to Supreme Court review." *Holland v. Nat'l Mining Ass'n*, 309 F.3d at 815; *see also Virginia Soc'y for Human Life v. Federal Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) (A nationwide injunction "has the effect of precluding other circuits from ruling on the constitutionality" of an agency's regulation.); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (nationwide injunctions "have a detrimental effect by foreclosing adjudication by a number of different courts and judges.").

Yet that is exactly what happened here. The Ninth Circuit could issue a ruling any day which could quite conceivably conflict with this injunction. Ultimately, especially if a circuit split arises, the Supreme Court may weigh in and decide the important issues at stake in this litigation.[15] The Networks should not be permitted to convert a "win" in this Circuit into an injunction that prevents FilmOn X from operating in circuits "where the injunction would not issue under the law of another circuit." *BDCS*, 915 F. Supp. 2d at 1142-43 (quoting *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 773 (9th Cir. 2008) (reversing grant of nationwide injunction)).

---

[15] In fact, on October 11, 2013, the plaintiff-networks in the Second Circuit case filed a petition for writ of certiorari before the Supreme Court.

And this need not have happened.  Supreme Court and other authorities have made clear that, given the equitable nature of injunctions, courts have the flexibility to use principles of comity to limit injunctive relief.  *See Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 119-20 (1981). ("Comity has an established and substantial role in informing the exercise of the court's discretion" when a "federal court is asked to employ its historic powers as a court of equity, and is called upon to decide whether to exercise the broadest and potentially most intrusive form of judicial authority."); *see also N.L.R.B. v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 893 (7th Cir. 1990) ("The issuance of an injunction is the exercise of an equitable power, and is subject to the equitable constraints that have evolved over centuries in recognition of the heavy costs that injunctions can impose");  *NAACP, Jefferson Cnty. Branch v. Brock*, 619 F. Supp. 846, 853 (D.D.C. 1985) ("Comity interests are advanced when 'courts of coordinate ranks are respectful of each other's orders, as well as careful to avoid hindering each other's proceedings.'") (quoting *Schauss v. Metals Depository Corp.,* 757 F.2d 649, 654 (5th Cir.1985)).

Finally, the broad geographic scope of the injunction has exponentially compounded the harm suffered by FilmOn X.  While FilmOn X is enjoined from offering a large portion of its services in most of the country, its main competitor, Aereo, is not so enjoined.  Aereo, which currently operates in New York, Atlanta,

Boston, Miami and Salt Lake City and has announced plans to expand to eighteen other major markets in the U.S., is well-positioned to take advantage of the injunction in this case by seizing a greater market share in the industry for Internet streaming of free-over-the-air broadcast television.  Should the virtual nationwide injunction remain, it will cause FilmOn X extreme revenue losses, market share losses, loss of brand recognition, loss of customer loyalty, lost opportunities with vendors and sponsors and lost goodwill.

This Court should reverse and vacate the injunction in its entirety.  If it does not, it should at least modify the injunction to limit its harmful effects to the D.C. Circuit.

## CONCLUSION

For the reasons set forth above, this Court should reverse the district court's rulings.

DATED: December 5, 2013                    BAKER MARQUART LLP

/s/ Ryan G. Baker
Ryan G. Baker

*Attorneys for Defendants-Appellants FilmOn X, LLC, FilmOn.TV, Inc., FilmOn.TV Networks, Inc., and FilmOn.com, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 37(a)(7) and D.C. Circuit Rule 32(a)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

1.       Exclusive of the exempted portions of the brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B), the brief contains 12,547 words.

2.       The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

DATED: December 5, 2013                              BAKER MARQUART LLP


                                                                  /s/ Ryan G. Baker
                                                                  Ryan G. Baker

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court in the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

DATED: December 5, 2013                    BAKER MARQUART LLP

                                           /s/ Ryan G. Baker
                                           Ryan G. Baker